UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TEXAS

| | |
|---|---|
| ELEANOR Z. RABIN,  an individual,<br><br>　　　Plaintiffs,<br><br>　　　v.<br><br>DOUGLAS A. MCCLAIN, SR., an individual, ARGYLL BIOTECHNOLOGIES, LLC, a Texas limited liability company, PADMORE HOLDINGS, LTD., and JAMES T. MICELI, an individual.<br><br>　　　Defendants. | CASE NO. SA-10-CA-0981 XR<br><br>**FIRST AMENDED COMPLAINT FOR:**<br>**1) VIOLATION OF SECURITIES EXCHANGE ACT;**<br>**2) FRAUD AND FRAUD IN THE INDUCEMENT;**<br>**3) BREACH OF CONTRACT;**<br>**4) VIOLATION OF RICO;**<br>**5) CONSPIRACY TO VIOLATE RICO; and**<br>**6) CIVIL CONSPIRACY;** |

Now comes the plaintiff ELEANOR Z. RABIN (collectively, "PLAINTIFF") and for her complaint against ARGYLL BIOTECHNOLOGIES, LLC, JAMES T. MICELI, PADMORE HOLDINGS, LTD., DOUGLAS A. MCCLAIN, SR., (collectively, "DEFENDANTS") and state as follows:

**Parties**

1.　　　Plaintiff, Eleanor Z. Rabin ("RABIN"), is a resident of Florida.

2.　　　Immunosyn Corporation ("IMMUNOSYN"), is a Delaware corporation with its principal place of business at 10815 Rancho Bernado Road, Suite 101, San Diego, California.

3.　　　Defendant, Argyll Biotechnologies, LLC ("ARGYLL BIOTECH"), is a Texas limited liability company with its principal place of business at 10815 Rancho Bernado Road, Suite 101, San Diego, California.

4.　　　Defendant, James T. Miceli ("MICELI"), is a resident of California.  MICELI is the Chief Executive Officer of ARGYLL BIOTECH and has done business in the State of Texas during the relevant time frame.

1

5.     Defendant, Douglas A. McClain, Sr. ("MCCLAIN, SR.") is a resident of Texas. MCCLAIN SR. is an owner and/or controlling person with respect to ARGYLL BIOTECH and holds himself out to be ARGYLL BIOTECH's Chief Science Officer.

6.     Defendant, Padmore Holdings, Ltd. ("PADMORE"), is a British Virgin Islands entity with agents located in San Antonio and Houston, Texas.

7.     Douglas A. McClain, Jr. ("MCCLAIN, JR.") is a resident of Georgia. MCCLAIN, JR. is an owner and/or controlling person of ARGYLL BIOTECH and holds himself out to be an officer of IMMUNOSYN.

**Subject Matter Jurisdiction and Venue**

8.     This action is brought personally by PLAINTIFFS pursuant to the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78m, 78r and 78t and RICO statute 18 U.S.C. § 1964 *et seq*.  Jurisdiction of this court and venue in this district are proper pursuant to 15 U.S.C. § 78aa and 18 U.S.C. § 1964 *et seq*.  Further, jurisdiction is conferred under 15 U.S.C. § 1332(a)(1) because PLAINTIFFS and DEFENDANTS are citizens of different states and the amount in controversy exceeds $75,000 in damages.

**Personal Jurisdiction**

9.     Argyll Equities, LLC is a Texas limited liability company of which Defendant MICELI is a 50% owner and officer.

10.     MICELI conducted business through Argyll Equities, LLC in the State of Texas from incorporation through at least 2008, as evidenced by the following:

a.  MICELI conducted business in the State of Texas as evidenced by the loan transactions described in various lawsuits brought by T. Paul Buhlman and Gerard Schlief.

b.  Argyll Equities, LLC maintained a business address at 1580 South Main Street, Boerne, Texas at least during 2008.

11.     ARGYLL BIOTECH is a Delaware limited liability company of which Defendant Miceli is a 50% owner and officer.

12.     ARGYLL BIOTECH has conducted business in the State of Texas continuously from its incorporation to this day as supported by the following:

     a.  In 2002, MICELI and non-party Douglas A. McClain, Jr. retained J. Ken Nunley (a Texas attorney working Texas) to represent them in various corporate matters.

     b.  During at least 2008, ARGYLL BIOTECH contracted with Iso-Tex Diagnostics, located in Friendswood, Texas, to manufacture a drug called SF-1019 that was then distributed and administered to patients through various doctors, including Dr. Erickson in Texas.

     c.  Per its website, ARGYLL BIOTECH continues to utilize Dr. Erickson, located in Texas, as an outside advisor or consultant.

     d.  ARGYLL BIOTECH currently employs MCCLAIN, SR., a resident of Boerne, Texas, as a consultant, with a title of Chief Science Officer or Director of Public Relations.

13.     PADMORE is an alleged British Virgin Islands entity with agents located in San Antonio and Houston, Texas.

     a.  J. Ken Nunely, Esq. of Texas, is an agent of Padmore Holdings, Ltd. with an address of 1100 N.W. Loop 410, Suite 207, San Antonio, Texas, per its SEC filings.

     b.  Lynn Booker, located in Houston, Texas, is a director of Padmore Holdings, Ltd. and likely the accountant for said business.

14.     MICELI is a 45% owner of PADMORE and MCCLAIN, SR. is a 10% owner of PADMORE.

15.     During 2007-2008, MICELI had contact with numerous Texas residents on behalf of PADMORE, allegedly gifting them shares of stock held by PADMORE in Immunosyn Corporation.  This contact was specific in relation to the fraudulent scheme to sell Immunosyn Corporation stock through an offshore entity to avoid taxes and insider trading disclosures. Further, the gifting and sale of shares of stock through PADMORE is part of the same fraudulent scheme committed upon the PLAINTIFF.

16.     MICELI and MCCLAIN, SR. personally received money from the sale of Immunosyn Corporation stock through PADMORE.

17.     During 2007-2008, MCCLAIN, SR. negotiated certain settlement agreements within the State of Texas concerning the potential legal liability of MICELI and others for conduct committed within the State of Texas.

18.     Pursuant to an agreement between MICELI, non-party Doug McClain, Jr. and T. Paul Bulmahn, J. Ken Nunley Esq. is physically holding shares of Immunosyn Corporation in the State of Texas issued in the name of ARGYLL BIOTECH and PADMORE.

19.     MICELI previously submitted to the jurisdiction of the State of Texas and allowed judgment to enter against him by consent in the amount of $69,522,500.

20.     MICELI was the sole owner of Cuxhaven Holdings, Ltd., an alleged British Virgin Islands entity with an address of 1100 N.W. Loop 410, Suite 207, San Antonio, Texas.

## Background of the Defendants and Corporate Entities

21.     On or about January 15, 1999, MICELI, MCCLAIN, SR. and MCCLAIN, JR. entered into a written partnership agreement, "for the purpose of devising, creating, designing, pursuing, formulating, enacting and engaging in all companies, corporations, partnerships or legal entities which are or have been or will be used by the parties for the purpose of creating any income or tangible item recognized as having value foreign or domestic" with a term of "fifteen

years." (hereinafter the "Partnership Agreement").

22.   On or about August 26, 1999, MICELI was convicted of felony money laundering, forgery, perjury and theft over $100,000 in the State of Illinois.

23.   MCCLAIN, JR., SR., MCCLAIN and MICELI worked together at International Profit Associates ("IPA") in Illinois.

24.   Through IPA, MCCLAIN SR. became involved with a public entity known as Nextpath Technologies.  MCCLAIN SR. was able to obtain and sell a large volume of shares of Nextpath Technologies to unsuspecting investors, based on false information concerning the company, for approximately $6,000,000.

25.   MCCLAIN SR. received funds and/or distributed Nextpath Technologies stock certificates through the US mail or other carriers interstate to unsuspecting investors.

26.   MCCLAIN SR. communicated with prospective investors over the telephone interstate, to convince and deceive them into purchasing Nextpath Technologies stock.

27.   Salvatore and Frank Bramante (hereinafter the "Bramanates") were investors duped by MCCLAIN SR. to buy Nextpath Technologies stock based upon false and misleading information.

28.   The Bramantes were promised unrestricted stock in Nextpath Technologies, a public company, but after much delay, were provided with restricted stock by MCCLAIN, SR.

29.   The Bramantes sued MCCLAIN, SR. in United States District Court for the District of Massachusetts and obtained judgment against him for about $4,500,000.

30.   After MCCLAIN, SR.'s involvement with Nextpath Technologies, MCCLAIN, SR., MCCLAIN, JR. and MICELI left IPA and worked together in an entity called FIT Management.

31.   Money from the sale of Nexthpath Technologies stock was used to finance the start of FIT Management.  FIT Management financed the start of Argyll Equities, LLC.

32.     As a result of numerous civil judgments against FIT Management and/or MCCLAIN, SR., MCCLAIN, SR. did not publically own Argyll Equities, but instead operated for the company as a consultant and secret owner.

33.     Argyll Equities had the appearance of a legitimate financial/stock lender, but operated more akin to a Ponzi scheme, as described in a lawsuit brought by Gerald W. Schlief, Southern District of Texas, Houston Division, C.A. No. 08-cv-2128.  The Gerald W. Schlief lawsuit alleges that MICELI, MCCLAIN SR. and others violated the Racketeer Influenced and Corrupt Organizations Act ("RICO") and committed numerous racketeering activities.

34.     Argyll Equities was used to defraud several borrowers and/or companies, including but not limited to Gerald W. Schlief, Siko Venture Limited, Louis D. Paolino, Jr., and Servicios Directivos Servia, S.A. de  C.V.   Each of these persons/entities brought civil lawsuits against Argyll Equities.

35.     Upon information and belief, numerous unsatisfied civil judgments exist against Argyll Equities, FIT Management, and MCCLAIN, SR. for fraud, the Ponzi scheme described in the Gerald Schlief Complaint, securities fraud and/or stock lending fraud.

36.     During Argyll Equities' demise as an allegedly reputable and financially stable company, through numerous lawsuits and judgments entering against it, Argyll Equities' financed the start up of ARGYLL BIOTECH.

37.     ARGYLL BIOTECH and/or Argyll Equities financed the start up of IMMUNOSYN and financially control IMMUNOSYN.

38.     At all relevant times hereto, ARGYLL BIOTECH claimed to own, develop, and promote a drug called SF-1019.

39.     At all relevant times hereto, IMMUNOSYN claimed in its SEC filings and website to own the exclusive rights to market and sell SF-1019.

40.     Similar to MCCLAIN, SR.'s false and misleading promotion and sale of Nextpath Technologies stock, the DEFENDANTS have engaged in the false and misleading promotion of IMMUNOSYN stock, for financial gain, to the detriment of others.

41.     The DEFENDANTS have been promoting IMMUNOSYN stock through various mediums so that they may sell their own stock at a great profit, while investors, such as PLAINTIFF were unable to sell their stock because it was not delivered as promised.

42.     Upon information and belief, the DEFENDANTS, personally, through various agents, and through entities that they control, have sold IMMUNOSYN stock from April 2007 through the present totaling more than $14,000,000.

43.     MICELI and MCCLAIN, SR. have been personally involved in the development of media statements and promotional statements made on their companies' websites concerning SF-1019.

44.     MICELI, MCCLAIN, SR., and MCCLAIN. JR. control Argyll Equities, ARGYLL BIOTECH and IMMUNOSYN.

45.     MICELI, MCCLAIN, SR., and MCCLAIN, JR. have financially stripped Argyll Equities and ARGYLL BIOTECH of assets purposely and through the judgments rendered against said companies due to their active fraud.  Prior to leaving Argyll Equities and ARGYLL BIOTECH "judgment proof," said entities were used by MICELI and MCCLAIN, SR. to commit fraud upon the PLAINTIFF.

46.     With respect to the operation of Argyll Equities and ARGYLL BIOTECH, MICELI, MCCLAIN, SR., and MCCLAIN. JR. have failed to follow corporate formalities, segregate their personal assets from business assets, and make required tax filings for money received by them from the companies and money paid to employees, consultants, and 1099 labor.

47.     MICELI, MCCLAIN, SR., and MCCLAIN, JR. are the alter egos of Argyll Equities, ARGYLL BIOTECH and IMMUNOSYN.

<b>The Fraud Upon the Plaintiff</b>

48.     In 2006, MCCLAIN, SR. enlisted the help of Leo From, PLAINTIFF'S boyfriend, to sell IMMUNOSYN stock.

7

49.     MCCLAIN, SR., MICELI, and MCCLAIN, JR. devised a scheme wherein they would associate with and befriend persons in local communities to sell IMMUNOSYN stock. The salespersons or agents they associated with were not licensed stock brokers or salesperson, simply people who could draw upon their connections and friendships to sell stock in a hyped up new company called IMMUNOSYN.

50.     Two persons enlisted by MICELI, MCCLAIN, SR. and MCCLAIN, JR. to sell stock were Dr. Jochen Brenner and Mr. Leo From.

51.     The scheme to sell stock was as follows:  MICELI, MCCLAIN, SR. and/or MCCLAIN, JR. would convince a local "agent" to accept stock as a gift or an advance from one of the entities holding said stock for their benefit.  The stock would be sold by the local agent and the funds transferred to MICELI, MCCLAIN, SR. and/or their companies.  The local agent would be gifted stock as his commission or in certain instances the agent retained some of the proceeds from the sale of stock or could sell the stock he was gifted.

52.     The scheme allowed MICELI, MCCLAIN, SR. and MCCLAIN, JR. to have agents convince their friends and family to buy stock, relying upon their trust and relationships to complete the deal, while they fed the local agent "hype" about the stock that the local agent could repeat and "hype" to friends and family, the local agent receiving a healthy commission to convince people to buy the stock.

53.     This "agent" network extended the reach of the DEFENDANTS to sell stock and also insulated them from directly committing fraud.  Most people who bought stock never talked to MICELI, MCCLAIN, SR. and MCCLAIN, JR., but MICELI, MCCLAIN, SR. and MCCLAIN, JR. received all or some of the money from these individuals buying stock.

54.      The use of agents to sell gifted stock also prevented MICELI, MCCLAIN, SR. and MCCLAIN, JR., as insiders of IMMUNOSYN, from having to disclose the sale of stock as insiders and also insulated them from having to report the taxable capital gains from the sale of these securities.

## COUNT I – THE EXCHANGE ACT

### (Against MCCLAIN, SR., and ARGYLL BIOTECHNOLOGIES)

55.     PLAINTIFF hereby incorporates and restates herein the foregoing paragraphs 1-54 as if fully stated herein.

56.     PLAINTIFF is a senior citizen who suffers from Charcot-Marie-Toothe ("CMT").

57.     PLAINTIFF found out about IMMUNOSYN stock and SF-1019 through her boyfriend who was selling SF-1019 for MCCLAIN, SR. and/or Argyll Biotechnologies, LLC. She learned from her boyfriend that IMMUNOSYN would own and sell SF-1019 to the public.

58.     PLAINTIFF heard from her boyfriend, Leo From, about the positive news concerning SF-1019 and how it could help with various diseases.

59.     Suffering from CMT, PLAINTIFF, living in Florida, telephoned MCCLAIN, SR. during December 2006, to learn if SF-1019 would help her medical condition.  MCCLAIN, SR. told PLAINTIFF that SF-1019 should most certainly help her and that he would send her some vials of SF-1019 for a doctor to administer to her.  He also told her that SF-1019 had FDA approval in Utah.

60.     PLAINTIFF also asked MCCLAIN, SR. if she could buy stock in the company. MCCLAIN, SR. told PLAINTIFF that she could buy stock.  PLAINTIFF understood that MCCLAIN, SR. worked for ARGYLL BIOTECH and that his family owned the company.

61.     During December 2006, PLAINTIFF, calling from Florida, informed MCCLAIN, SR. via telephone that she was selling her condo and that she would receive about $80,000 from the sale that she would like to invest in order to obtain enough money to buy another home. MCCLAIN, SR. said that she could buy 80,000 shares with $80,000 and that she would become a millionaire because the stock was going to come out on the NASDAQ at $15.00 per share.

62.     During this phone call, PLAINTIFF informed MCCLAIN, SR. that the $80,000 was all the money she had in the world and that she was looking to MCCLAIN, SR. for guidance that it was right thing to do so that she could use the profits to buy a new home.  MCCLAIN, SR. said it was guaranteed safe.

9

63.    During this phone call, MCCLAIN, SR. also told PLAINTIFF that he would send the stock certificates to her before the stock went public as long as she sent him the money.

64.    PLAINTIFF was told by MCCLAIN, SR. to send the money to an account in his mother's name, Muriel McClain.  PLAINTIFF agreed and sent $80,000 in early 2007 ($50,000 on January 9, 2007 and $30,000 on January 23, 2007) to the bank account of MCCLAIN, SR.'s mother.

65.    During December 2006 to January 2007, during phone calls between PLAINTIFF and MCCLAIN, SR., MCCLAIN, SR. told PLAINTIFF that the stock being sold to her was coming from his family trust.

66.    MCCLAIN, SR.'s representations concerning said family trust were false because the stock came from PADMORE HOLDINGS, LTD.

67.    MCCLAIN, SR. received PLAINTIFF's $80,000 prior to IMMUNOSYN going public, but he failed to send her the stock certificates until January/February 2008, long after IMMUNOSYN went public.

68.    After receiving PLAINTIFF'S money, MCCLAIN, SR. told the PLAINTIFF that he did not send her the shares right away because he did not want her to sell them on the open market.

69.    By the time PLAINTIFF received the IMMUNOSYN corporation stock it had dropped from the opening price of $15 per share to a few dollars per share.

70.    PLAINTIFF sold a small number of shares almost immediately after receipt, but she was informed by MCCLAIN, SR. during early 2008 that the stock was going to go back to $15 a share because they were going to obtain the FDA approval for the entire country, which she was previously told was already obtained for Utah, and that they were obtaining approval for sale of SF-1019 in Malaysia, so she held onto the stock and did not sell it at that time.

80.    During 2008, PLAINTIFF was regularly communicating with MCCLAIN, SR., who expressed that she should not sell her shares and she was fearful that MCCLAIN, SR. would become angry with her if she sold her shares against his instruction.

81.     Being desperate for money, PLAINTIFF ultimately sold her remaining stock for about $0.12 cents per share on the OTC, said stock never being listed on the NASDAQ and never receiving FDA approval anywhere, her overall loss equaling about $65,000.

82.     PLAINTIFF's boyfriend, Leo From, passed away in November 2008 and she has been homeless and dependent upon others for financial assistance since his death.

83.     MCCLAIN, SR. fraudulently induced PLAINTIFF into agreeing to purchase stock in IMMUNOSYN by directly representing that she would become a millionaire because the stock would open at $15.00 per share on the NASDAQ and by telling her, directly and through his agent, Leo From, that SF-1019 had FDA approval in Utah.

84.     MCCLAIN, SR. told PLAINTIFF that she would get her shares of stock in advance of the stock going public and PLAINTIFF reasonably relied upon MCCLAIN, SR.'s representation in buying said stock, so that she could sell it for $15.00 per share when it went public on the NASDAQ.  PLAINTIFF also reasonably relied upon MCCLAIN, SR.'s representation that SF-1019 had FDA approval in Utah, and was going to be listed on the NASDAQ, both of which MCCLAIN, SR. knew to be untrue at the time he made said representations.

85.     MCCLAIN, SR. breached his agreement to send PLAINTIFF the stock she purchased prior to it going public and he knowingly did not send her the shares she bought in order to prevent the sale of said stock to protect the stock price for his own benefit and the benefit of the other majority stock holders, MICELI, MCCLAIN, JR. and ARGYLL BIOTECH.

86.     As a result of MCCLAIN, SR. failing to send PLAINTIFF her stock prior to IMMUNOSYN going public, she was unable to sell it at $15 per share or the price said stock was being sold for on the opening day of trading.

87.     PLAINTIFF has suffered damages in an amount approaching $1,200,000 ($15 per share for 80,000 shares).

88.     ARGYLL BIOTECH and PADMORE are liable to the PLAINTIFF to the same extent as MCCLAIN, SR. as his alter ego and under a theory of respondeat superior.

WHEFEFORE, Plaintiff prays for damages against Douglas A. McClain, Sr., Padmore Holdings, Ltd., and Argyll Biotechnologies, LLC in an amount to be proven at trial, plus costs, interest and attorneys fees.

## COUNT II – FRAUD AND FRAUD IN THE INDUCEMENT

### (Against MCCLAIN, SR. and ARGYLL BIOTECH)

89.     PLAINTIFF hereby incorporate and restate herein the foregoing paragraphs 1-88 as if fully stated herein.

90.     In violation of common law or statute, MCCLAIN, SR., made several misrepresentations to PLAINTIFF in Florida via telephone during December 2006 to January 2007 concerning when he would send PLAINTIFF her stock, the fact that she would become a millionaire, that SF-1019 cured various diseases, that SF-1019 had FDA approval in Utah, and that IMMUNOSYN stock would be listed on the NASDAQ, in order to induce PLAINTIFF to purchase IMMUNOSYN stock from him.

91.     The representations made by MCCLAIN, SR. were false or misleading when made and he knew them to be false, because: 1) MCCLAIN, SR. did not intend on sending PLAINTIFF her stock prior to IMMUNOSYN going public, 2) SF-1019 has never had FDA approval in Utah or anywhere, 3) it has not been proven that SF-1019 cures any diseases, and 4) IMMUNOSYN stock was never listed on the NASDAQ.

92.     If PLAINTIFF had not been provided with false and/or misleading information by MCCLAIN, SR., she would not have purchased IMMUNOSYN stock.

93.     PLAINITIFF reasonably relied upon MCCLAIN, SR.'s material representations in purchasing and continuing to hold IMMUNOSYN stock.

94.     As a result of the purchase of stock in IMMUNYSON, PLAINTIFF lost $65,000 and suffered about $1,200,000 in lost profits.

95.     The conduct of MCCLAIN, SR., as alleged above, was oppressive, fraudulent and malicious and was committed willfully and/or with reckless disregard for the rights of PLAINTIFF, and without just cause or excuse.  Accordingly, PLAINTIFF is entitled to exemplary damages in an amount to be determined at trial.

WHEFEFORE, Plaintiff prays for damages against Douglas A. McClain, Sr. and Argyll Biotechnologies, LLC in an amount to be proven at trial, plus costs, interest, attorneys' fees, and exemplary damages.

## COUNT III – BREACH OF CONTRACT

### (Against ARGYLL BIOTECH and MCCLAIN, SR.)

96.     PLAINTIFFS hereby incorporate and restate herein the foregoing paragraphs 1-95 as if fully stated herein.

97.     PLAINTIFF and MCCLAIN, SR. orally agreed that she would pay $80,000 in exchange for IMMUNOSYN stock that would be sent her prior to it going public so that she could sell it on the opening day at $15 per share.

98.     MCCLAIN, SR. did breach the oral agreement by failing and/or refusing to send PLAINTIFF her IMMUNOSYN stock until months after it went public.

99.     PLAINTIFF was unable to sell her stock at $15 per share as she anticipated based upon the representations of MCCLAIN, SR.

100.     PLAINTIFF has suffered damages as a result of MCCLAIN, SR.'s failure to deliver said stock timely, including direct damages and lost profits in the amount of about $1,200,000.

WHEFEFORE, Plaintiff prays for damages against Douglas A. McClain, Sr. and Argyll Biotechnologies, LLC in an amount to be proven at trial, plus costs, interest, consequential damages and lost profits.

13

## COUNT IV – VIOLATION OF RICO

(Against MICELI and MCCLAIN, SR.)

101.    PLAINTIFFS hereby incorporate and restate herein the foregoing paragraphs 1-100 as if fully stated herein.

102.    MICELI, MCCLAIN, SR. and MCCLAIN, JR., operate as an enterprise through various entities, including PADMORE, as described *supra*, and through their association and agreement to make money through the sale of IMMUNOSYN stock and otherwise.

103.    MICELI, MCCLAIN, SR. and MCCLAIN, JR., have engaged in a pattern of racketeering activity, to the detriment of others, including PLAINTIFF.

104.    MICELI, MCCLAIN, SR. and MCCLAIN, JR., have engaged in monetary transactions (including but not limited to the creation of IMMUNOSYN and ARGYLL BIOTECH) with money derived from unlawful activities and/or racketeering activity in prior enterprises.

105.    MICELI and MCCLAIN, SR. continue to commit unlawful activity, personally and through agents, by selling stock without a license to do so.

106.    MICELI and MCCLAIN, SR. agreed to and have committed mail fraud by sending stock through the mail to more than two individuals, including PLAINTIFF, based upon false representations and in furtherance of the fraud described *supra*.

107.    MICELI and MCCLAIN, SR. agreed to and have committed wire fraud by communicating false and misleading statements on more than two occasions via telephone interstate to PLAINTIFF to induce her to purchase Immunosyn Corporation stock and by causing her to send money via wire transfer on two occasions interstate to a bank account for the benefit of MCCLAIN, SR.

108.    On August 21, 2007, MICELI sent PLAINTIFF a letter which falsely stated that she was being gifted 80,000 shares of Immunosyn Corporation stock.

109.    MICELI and MCCLAIN, SR. mailed PLAINTIFF her stock during late January/early February 2008 in furtherance of the fraud committed upon her.

14

110.    MICELI separately mailed between May 2007 and February 2008 numerous Immunosyn Corporation stock certificates in more than two separate mailings to individuals residing in Texas and Florida based upon false representations to induce the purchase of said IMMUNOSYN stock from MICELI, MCCLAIN, SR. and their companies in furtherance of the fraud described *supra*.

111.    MICELI acted in furtherance of MCCLAIN, SR.'s wrongful conduct described herein by supplying the stock that MCCLAIN, SR. was selling in IMMUNOSYN and by sharing in the profits from the sale of stock by MCCLAIN, SR. and others acting as their agents.

112.    As a result of the unlawful conduct and RICO violations committed by MICELI and MCCLAIN, SR., PLAINTIFF has been damaged.

WHERFORE, Plaintiff prays for damages in amount to be proven at trial as against James T. Miceli and Douglas A. McClain, Sr. including but not limited to compensatory damages, lost profits, treble damages, interest, costs and attorneys fees.

## COUNT V – CONSPIRACY TO VIOLATE RICO

### (Against MICELI, PADMORE and MCCLAIN, SR.)

113.    PLAINTIFF hereby incorporate and restate herein the foregoing paragraphs 1-112 as if fully stated herein.

114.    RICO prohibits any person from conspiring to violate RICO.

115.    MICELI, MCCLAIN, SR., MCCLAIN, JR., and agents of PADMORE had agreements and/or understandings with each other to engage in racketeering activities.

116.    MICELI, agents of PADMORE, and MCCLAIN, SR. have committed acts in furtherance of said conspiracy as described *supra*.

117.    MICELI, MCCLAIN, SR., MCCLAIN, JR., and agents of PADMORE have committed racketeering activities.

118.    Plaintiff has been harmed by MICELI, PADMORE, and MCCLAIN, SR.'s conspiracy to violate RICO and have suffered actual damages.

15

119.    As a result of MICELI and MCCLAIN, SR.'s unlawful conspiracy to commit RICO violations, Plaintiff has suffered damages.

WHERFORE, Plaintiff prays for damages in amount to be proven at trial as against James T. Miceli, Padmore Holdings, Ltd., and Douglas A. McClain, Sr. including but not limited to compensatory damages, lost profits, treble damages, interest, costs and attorneys fees.

## COUNT VI – CIVIL CONSPIRACY

### (Against MICELI, PADMORE, and MCCLAIN, SR.)

120.    PLAINTIFF hereby incorporates and restate herein the foregoing paragraphs 1-119 as if fully stated herein.

121.    MICELI, MCCLAIN, SR. and MCCLAIN, JR. had agreements and/or understandings with each other to sell stock to unsuspecting investors, such as PLAINTIFF, based upon false pretenses.

122.    MICELI, agents of PADMORE, and MCCLAIN, SR. have committed acts in furtherance of the fraud committed upon PLAINTIFF, including receiving money from the PLAINTIFF and/or mailing stock certificates to the PLAINTIFF.

123.    PLAINTIFF has been harmed by MICELI, PADMORE, and MCCLAIN, SR.'s conspiracy to commit fraud upon her.

124.    During October 2010, PLAINTIFF read the complaint filed in the matter styled Denise Campbell v. James T. Miceli et al. pending in the United States District Court for the Southern District of Texas which caused her to realize that fraud had been committed upon her and to seek legal assistance from counsel.

125.    Given that the fraud was concealed from PLAINTIFF, the statute of limitations should be tolled in this matter.  Florida law should apply since PLAINTIFF was always in Florida during the matters described in this complaint.

126.    Further, given that MCCLAIN, SR., PADMORE, and MICELI, committed fraud upon the PLAINTIFF, a senior citizen, taking funds from the sale of her primary residence and intended for the purchase of her primary residence, she is entitled to an award of punitive damages.

WHERFORE, Plaintiff prays for damages in amount to be proven at trial as against James T. Miceli, Padmore Holdings, Ltd., and Douglas A. McClain, Sr. including but not limited to compensatory damages, lost profits, penal damages, interest, costs and attorneys fees.


Respectfully submitted,

*/s/Andrew J. Tine*
Counsel for Plaintiffs
MA Bar#633639
251 Thames Street, Suite 2
Bristol, Rhode Island 02809
(401) 396-9002 - Tel
(401) 396-9479 - Fax
Email: atine@tinelaw.com

*/s/Gershon D. Cohen*
Counsel for Plaintiffs
State Bar No. 04508325
1250 N.E. Loop 410, Suite 234
San Antonio, TX 78209
(210) 748-8505 – Tel.
(210) 832-8003 – Fax